**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>Michael Dale Gilbert,<br><br>    Defendant. | No. CR-17-00670-001-PHX-GMS<br><br>**ORDER** |

Pending before the Court is the Motion to Suppress Statements of Defendant Michael Dale Gilbert. (Doc. 28). For the following reasons, the Court denies the motion.

**BACKGROUND**

Defendant Michael Gilbert was employed as a contractor with Pacific Architects and Engineers, Inc. ("PAE") and stationed in Afghanistan between April 2012 and December 2015. The Department of State and Office of the Special Inspector General for Afghanistan Reconstruction ("SIGAR") inspectors began investigating Mr. Gilbert for allegedly appropriating excess government property for personal use. As part of the investigation, in late 2015, Special Agents Erica Maldonado and W. Murray Strait sought to interview Mr. Gilbert. Agent Strait communicated with Perry Covey, one of Mr. Gilbert's supervisors at PAE. Agent Strait told Mr. Covey that he needed to speak with Mr. Gilbert at the SIGAR Office inside the United States Embassy in Kabul. Mr. Covey arranged for Mr. Gilbert to come to the SIGAR Office for the interview and to handle

other business for PAE at the Embassy. The interview was scheduled for November 30, 2015.

At the time of the interview request, Mr. Gilbert was stationed at Camp Alvarado in Kabul. Because of security concerns in Afghanistan, Mr. Gilbert was flown by helicopter to the Embassy despite the fact that the Embassy was only five miles away. Upon arrival, Mr. Covey escorted Mr. Gilbert to the SIGAR Offices. Mr. Gilbert had been to the Embassy before, had a security badge that permitted him to move around the buildings, and was staying the night at a PAE Office just outside the Embassy. Agent Strait met Mr. Gilbert at the SIGAR lobby and took him to a SIGAR conference room (where Agent Maldonado was also present).

Agent Strait testified that at the outset of the interview, he informed Mr. Gilbert that this was a non-custodial interview and Mr. Gilbert could leave anytime he desired.[1] Mr. Gilbert, by contrast, testified that Agent Strait only informed Mr. Gilbert that he could decline to answer questions, not that he could end the interview and leave at any time. According to Agent Strait, the conversation was non-combative and Mr. Gilbert admitted wrongdoing and apologized for his mistakes within the first ten minutes of the interview. Mr. Gilbert, however, testified that Agent Strait confronted him with evidence and documents immediately. Mr. Gilbert also testified that he asked Agent Strait if he needed a lawyer and was told that he did not. Agent Strait states that Mr. Gilbert only asked about a lawyer during a third interview by phone (Mr. Gilbert had returned to Arizona) on December 20, 2015. There was one break during the interview, in which Agent Strait retrieved water for Mr. Gilbert. Mr. Gilbert asserts that he also asked to take a cigarette break at this time and was told that he could not. The last hour of the interview was primarily spent waiting for computer systems to load Mr. Gilbert's emails, which he agreed to show the Agents. At the conclusion of the interview, Agent Strait phoned Mr. Covey. Mr. Covey came back to the SIGAR Office and left with Mr. Gilbert.

///

---

[1] This is also memorialized in Agent Strait's investigative report. (Doc. 29, Ex. 1A).

Mr. Gilbert argues that this was a custodial interrogation, and as a result, the failure to give *Miranda* warnings should result in a suppression of his statements. Mr. Gilbert also argues that the alleged *Miranda* violation at the November 30, 2015 interview taints the statements made by Mr. Gilbert in subsequent interviews on December 5, 2015 and December 20, 2015.

**DISCUSSION**

In *Miranda v. Arizona*, the Supreme Court held that an individual in "custody or otherwise deprived of his freedom of action in a significant way" must receive warnings about the individual's rights to remain silent and to have an attorney. 384 U.S. 436, 444 (1966). Because almost "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime," not all questioning by police triggers the *Miranda* requirements. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). In determining whether there was a custodial interrogation, "the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody'" and "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). This inquiry "focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). Therefore, the Court must determine whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987). The Ninth Circuit uses a test that considers the following factors: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).

The language used to summon the defendant is generally considered non-custodial when "the defendant 'agreed to accompany' officers to the police station or to an interrogation room." *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009). In *Bassignani*, the officers approached the defendant, asked him to leave his computer, and instructed him to go to a conference room. *Id*. The Ninth Circuit noted that even though "[a]n 'instruction' is short of an 'order,' . . . it [was] plain that Bassignani did not voluntarily 'agree to accompany' the officers to the conference room." *Id*. In this case, the language used to summon Mr. Gilbert came from Mr. Covey, a private citizen. Defense counsel conceded at the Suppression Hearing that Mr. Covey's statements were not imputable to the government. Therefore, the first factor does not help in determining whether the interview was custodial.

As for the second factor, the parties contest the extent to which Mr. Gilbert was confronted with evidence of his guilt. Agent Strait testified that very soon after the interview began, Mr. Gilbert admitted to making a mistake and apologized for what he had done.[2] Agent Strait further testified that, at the time of the interview, he had been investigating Mr. Gilbert for about a year and had discovered substantial amount of evidence regarding Mr. Gilbert's guilt. Some of this evidence was shown to Mr. Gilbert during his interview. Mr. Gilbert alleges that Agent Strait showed the evidence to Mr. Gilbert within the first ten minutes of the interview (and therefore, prior to any alleged confession). Agent Strait, however, stated that Mr. Gilbert began speaking about his activities before he was shown any documents. Agent Strait's investigative report recites that Mr. Gilbert "advised he then made a 'stupid' mistake and knew this was wrong . . . and had collected several boxes of [excess government property] . . . which he shipped to his personal residence in Arizona." (Doc. 29, Ex. 1A). This admission occurs before Agent Strait's report details the evidence that Mr. Gilbert was shown, such as log books and emails. *Id*. Even accepting Mr. Gilbert's version of the events, where he was

---

[2] Agent Strait filled out an interview log contemporaneously with the interview, in which he noted that Mr. Gilbert's alleged confession occurred at 16:50 military time (4:50 pm). The interview began at 16:40 (4:40 pm). (Doc. 29, Ex. 1B).

- 4 -

immediately shown documentation of his alleged crimes, there is only so much evidence that could have been shown in those ten minutes before Mr. Gilbert apologized for his actions. The amount of evidence that was shown after Mr. Gilbert's alleged confession is not as relevant given the speed with which Mr. Gilbert began cooperating with the Agents. Moreover, the Ninth Circuit has found that the tone with which an interview is conduct is relevant to this factor. Where an interrogator adopts an "aggressive, coercive, and deceptive tone," the defendant is more likely to be considered in custody. *Id*. By contrast, where investigators "did not attempt to challenge [the defendant's] statements with other 'known facts' suggesting his guilt, [and] they merely asked [the defendant] about the allegations," the interview is more likely non-custodial. *United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005). By both Mr. Gilbert and Agent Strait's accounts, the interview was fairly cordial, conversational, and non-combative. The tone of the interview combined with the minimal evidence presented before Mr. Gilbert began apologizing point this factor towards a non-custodial finding.

In the third factor, the Court considers the physical surroundings of the interrogation. When an interrogation is conducted in "familiar surroundings," this factor weighs against a finding of custody. *Bassignani*, 575 F.3d at 885 (citing *United States v. Eide*, 875 F.2d 1429, 1437 (9th Cir. 1989)). The familiarity of the location, however, can be "neutralize[d]" by "isolating the defendant from the outside world." *Kim*, 292 F.3d at 977. In *Kim*, the defendant was interrogated by police in her own store, a familiar location. But, "the police in [*Kim*] temporarily took complete control of Kim's store, creating a 'police-dominated atmosphere,' in which the police kept Kim physically isolated from two family members." *Id*. When Kim's husband tried to enter the store, the door was shut in front of him and locked from the inside by the police. *Id*. at 971. Although Mr. Gilbert did not work at the Embassy, he had been there on other occasions. The door to the conference room was closed, but it was not locked, unlike in *Kim*. Mr. Gilbert had a badge that allowed him to move around the Embassy complex without needing an escort. Mr. Gilbert was transported to the interview by a helicopter. However,

that appears to have been a necessity given the security concerns in Afghanistan. The transportation was organized by PAE, and not the government. Mr. Gilbert's return helicopter flight was not scheduled until the next day, but he had a room reserved to stay the night near the Embassy Compound. Therefore, Mr. Gilbert was interviewed in a generally familiar location, in a room that was not locked. He had freedom of movement around the Embassy and had a room to return to should he have chosen to end the interview. *See Bassignani*, 575 F.3d at 885 (finding that where the defendant was interviewed in a conference room at his workplace and was not prevented from leaving the room, the physical surroundings suggested the defendant was not in custody). This factor weighs against a finding of custody.

The fourth factor is the duration of the interrogation. The Ninth Circuit has noted that "our precedents suggest that a two-and-a-half interrogation is at the high end." *Id*. at 886. Mr. Gilbert was in the room with Agents Strait and Maldonado for approximately three hours. This is similarly on the high end. However, the last hour was spent waiting due to technological delays and no further interrogative questions were asked. Moreover, Mr. Gilbert admitted his responsibility within the first ten minutes of the interview. The length of the interview, thus, seems more due to a willing conversation than a "marathon session designed to force a confession." *Id*. (quoting *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985)). Following *Bassignani*, this Court determines that this factor leans towards a custodial determination, but the Court accords this factor less weight. 575 F.3d at 886.

Finally, the Court considers the degree of pressure used to detain the defendant. The Ninth Circuit has "consistently held that a defendant is not in custody when the officers tell him that he is not under arrest and is free to leave at any time." *Id*. Agent Strait testified that he told Mr. Gilbert that he was not under arrest and was free to leave. Mr. Gilbert testified that he was told he could decline to answer questions, was not under arrest, and would be able to leave at the end of the interview. Mr. Gilbert states that he was not told that he could end the interview or leave the interview early. In *Bassignani*,

the Ninth Circuit confronted a case where the officers never explicitly told the defendant that he was free to leave. *Id*. Despite this, the Ninth Circuit found that the factor weighed towards a non-custodial finding because the officer told the defendant he was not under arrest and the defendant was never physically restrained. *Id*. There is no dispute that here, as well, Mr. Gilbert was told that he was not under arrest and would not be placed under arrest that evening. Therefore, even accepting Mr. Gilbert's version of the facts, there is insufficient evidence to support a finding that undue pressure was used to detain the defendant. Agent Strait was carrying a weapon and it is likely that Agent Maldonado was as well. The weapons remained holstered at all times and were never gestured to by the Agents. The presence of weapons was due to being in a war zone, and not any attempt to intimidate Mr. Gilbert. Mr. Gilbert also alleges that he requested to smoke a cigarette during the break in which Agent Strait got him water and that Agent Strait rejected the request. There is no supporting evidence for this claim, and Agent Strait's Investigative Report memorialized the break that was taken for water. This factor weighs against a finding of custody.

## CONCLUSION

Weighing the factors set out by the Ninth Circuit, the Court determines that Mr. Gilbert was not in custody during his interview with Agents Strait and Maldonado. Because the Defendant only argues that the second and third interviews were tainted by the lack of *Miranda* warnings in the first interview, and the Court has determined that *Miranda* warnings were not required, the Court denies the Motion to Suppress as to all three interviews.

**IT IS THEREFORE ORDERED** that the Motion to Suppress Statements of Defendant Michael Dale Gilbert (Doc. 28) is **DENIED**.

Dated this 20th day of April, 2018.

Honorable G. Murray Snow
United States District Judge